IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DT BORING, INC, ) | |
| ) | |
| Plaintiff, ) | No. 13 C 450 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| THE CHICAGO PUBLIC BUILDING ) | |
| COMMISSION, HARBOUR CONTRACTORS, ) | |
| INC, an Illinois corporation, OPTIMAL ) | |
| ENERGY, LLC, an Illinois limited liability ) | |
| company, and ENVIRONMENTAL DESIGN, ) | |
| INC., an Illinois corporation, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff DT Boring, Inc., filed an eight-count amended complaint against The Chicago Public Building Commission ("CPBC"), Harbour Contractors, Inc. ("Harbour"), Optimal Energy, LLC ("Optimal"), and Environmental Design, Inc. ("EDI"), (collectively, defendants). Plaintiff alleges that CPBC heads a RICO enterprise with the goal of fraudulently benefitting CPBC by constructing or renovating public buildings at or below their actual construction cost in a manner that enriches its "preapproved" subcontractors at the expense of other project subcontractors. Plaintiff alleges that Harbour and EDI are two of these "preapproved" subcontractors that participated in the RICO enterprise. Plaintiff alleges RICO violations by Harbour (Counts I, II and III) and EDI (Count III); as well as a lien on public funds against CPBC, Harbour and Optimal (Count IV); fraud against CPBC and Harbour (Count V); tortious interference with contract against CPBC and Harbour (Count VI); unjust enrichment against CPBC and Harbour (Count VII); and promissory estoppel against CPBC and Harbour (Count VIII). CPBC has filed a motion pursuant to Fed.R.Civ.P. 12(b)(1) and 28 U.S.C. 1367 (Doc. 21)

asking the court to decline to exercise supplemental jurisdiction over CPBC.  Harbour has also filed a motion to dismiss (Doc. 36) under Fed.R.Civ.Pro. 12(b)(1), arguing that plaintiff does not have standing to bring its RICO claims. EDI joins Harbour's 12(b)(1) motion.  For the reasons described below, the court grants Harbour's motion to dismiss for lack of standing and CBPC's motion to decline to exercise supplemental jurisdiction.

## BACKGROUND

Plaintiff is a Illinois corporation that consults on geothermal energy and participates in designing, drilling, and installing geothermal well fields and geothermal heating and ventilation systems for governmental, commercial, and residential structures.  The shares of the corporation are owned in joint tenancy by Tom Shelton ("Shelton") and his sons.  Plaintiff acted as a subcontractor and installer for Optimal, another subcontractor, on CPBC's 12th District Police Station Project in Chicago.  Plaintiff and Optimal entered into a second tier subcontract which called for plaintiff to drill 88 geothermal boreholes, install ground loops in the boreholes, dig trenches through which the upper portions of the ground loops would be connected to pressure-equalizing vaults, connect the ground loops to the vaults, then back fill the trenches as part of the HVAC system for the Police Station.  Optimal in turn entered into a subcontract with Harbour, which served as the general contractor for CPBC on the project.

*The Change Orders*

Plaintiff alleges that CPBC and Harbor provided plaintiff, through Optimal, a diagram purportedly showing the location of all underground obstructions so that plaintiff could determine where to place the bore holes.  Shortly after work began, however, plaintiff encountered underground obstructions that were not shown on the diagram, which resulted in the

2

need for plaintiff to relocate the planned boreholes.  Plaintiff alleges that CPBC's Assistant Project Manager and Project Manager, as well as Harbour's Project Manager, Sam Rae (Rae), orally gave Shelton permission to relocate the boreholes and understood the costs associated with doing so.  Plaintiff also allegedly received a forwarded email dated May 17, 2011, from CPBC's Assistant Project Manager to the Project Manager and other CPBC employees authorizing plaintiff to relocate its drilling rigs.

In early June 2011, Shelton inquired why Harbour had not issued written Field Orders regarding the drill rig relocations previously orally authorized.  Plaintiff alleges that Rae responded that Harbour had not issued Field Orders because CPBC did not want to pay for the additional costs incurred by the drill relocations.  When Shelton questioned this response, Rae allegedly reassured Shelton that the work was authorized and that Harbour simply had to "package" change orders and submit them simultaneously to be paid by CPBC.  Plaintiff therefore continued drilling the remainder of the relocated boreholes.  Plaintiff timely submitted written change orders to Optimal, and Optimal timely submitted its change orders to Harbour.

Plaintiff alleges that Rae reaffirmed his statement about the need to package change orders in a September 14, 2011, email to Shelton.  Plaintiff alleges that Rae's statement were corroborated by statements made by Mark Karaskiewicz, a Harbour employee, who allegedly told plaintiff's counsel in a phone call that plaintiff's and Optimal's change orders must be packaged with change orders from other subcontractors in order to be submitted to CPBC. In September 2011, Karaskiewicz allegedly submitted plaintiff's and Optimal's change orders to CPBC, but they were rejected as "insufficient."  Plaintiff claims that CPBC never intended to pay plaintiff for the additional work authorized and engaged in fraud and obfuscation to mislead

3

plaintiff so that plaintiff would continue to work on the project without being paid.

Plaintiff further claims that it is not the only subcontractor to have been defrauded of payment for authorized work by CPBC.  Plaintiff alleges that CPBC has engaged in a pattern of activity to skim profits from subcontractors by using similar tactics. According to plaintiff, CPBC will request bids on a project from general contractors, and those general contractors who are part of CPBC's enterprise will submit bids that are substantially lower than other general contractors.  The general contractors will then require the subcontractors to lower their preliminary bids in order to be awarded the subcontracts. CPBC will then award the contract to one of its enterprise subcontractors, who will then engage in the following behaviors: refusing to process change orders approving work performed outside of the scope of the original contracts so that CPBC gets the benefit of the additional work for free; creating phony "back charges" for subcontractors' purportedly defective work so that the general contractors can withhold the amount of those back charges;  refusing to pay the subcontractor's 10% retainage when due; simply refusing to pay the subcontractor at all; or agreeing to pay the retainage, change orders and/or amounts due, but only if the subcontractor agrees to a "buyout," or reduction in the amount owed.  These actions allow CPBC and the general contractors to earn profits on the projects, despite their low bids, by "pilfering" funds from the subcontractors.  The subcontractors fear retaliation in the form of exclusion from future projects and having additional funds withheld if they object to CPBC's practices.  These behaviors, plaintiff alleges, often cause the subcontractors to go out of business because they are unable to finance the construction projects or unable to sustain their businesses without payment.  Plaintiff cites instances of companies forced out of business by CBPC and its enterprise.

*The Asbestos*

Plaintiff alleges further damages from its work on the project. Around August 19, 2011, Shelton allegedly encountered a large, wrapped furnace pipe in a concrete culvert or tunnel. The pipe was removed and examined by one of Optimal's principals, who determined that it might contain asbestos. Plaintiff alleges that CPBC had knowledge of the possible contaminant prior to the start of the project and did not alert plaintiff, because CPBC's deputy director appeared to have knowledge of the location of the wrapped pipe without being told of the details of the discovery. EDI was called to test the pipe for asbestos and determined that the material was non-friable and therefore not dangerous. Plaintiff was ordered to continue working.

On September 1, 2011, one of the trenches plaintiff was working in was examined by Optimal and it was determined that it might contain asbestos. Work was halted pursuant to a formal Notice of Delay issued by Optimal, and EDI was called in to take samples of the material, which it concluded was non-friable. Plaintiff was ordered to continue to work and told to position workers downwind when backfilling the trenches. A formal back to work order was issued.

Shelton reported the asbestos to OSHA (the United States Occupational Safety and Health Administration), which conducted a site visit on September 9, 2011, and determined that friable asbestos was present and subsequently issued citations to Harbour and plaintiff. Shelton also notified the Illinois EPA (IEPA) of the potential contaminant.

On September 9, 2011, Optimal received test results that indicated that friable asbestos was present at the project site and Optimal issued a stop work order requiring plaintiff to vacate the site. Shelton also hired an independent environmental testing company to inspect the site,

5

and that company issued a report on September 19, 2011, finding that samples from the site contained friable asbestos. Due to the OSHA investigation and the positive test results, Harbour agreed to maintain the stop work order until abatement measures were taken and an industrial hygienist confirmed that the project site was safe.

On October 22, 2011, Harbour's industrial hygienist conducted a test for airborne asbestos particles. The industrial hygienist's tests came back negative for airborne asbestos. Plaintiff alleges that this test was inadequate because the testing occurred right after heavy rainfall, which caused the soil to turn to mud and prevented asbestos particles from becoming airborne. Plaintiff further alleges that one of the subcontractors had removed some asbestos from the original samples taken in September and fed those samples into his backpack, which continuously sampled the air for asbestos. Because all the backpacks came back negative for asbestos despite this subcontractor's actions, plaintiff alleges that the test results were forged, or that the backpacks were non-functioning.

Plaintiff claims that, for the duration of the stop work order, plaintiff had to continue to pay its workers because plaintiff had not been released from the project. Plaintiff communicated its concerns about cost to Harbour and Optimal. On November 1, 2011, CPBC's in-house counsel stated her position that it was not responsible for plaintiff's downtime costs because CPBC had not issued a stop work order.

On November 1, 2011, Rae ordered plaintiff "off the project" and plaintiff began to demobilize from the site. Harbour contacted Shelton and asked him to return to work, which Shelton did by delaying demobilization and performing work to winterize the geothermal field. On November 18, 2011, however, Rae again terminated plaintiff from the project. Plaintiff

6

claims that it has not been compensated for the additional costs incurred as a result of the stop work orders during the asbestos investigation. Plaintiff also states that it incurred costs in defending against OSHA's investigation of plaintiff for exposing its employees to the asbestos.

In November 2012, plaintiff filed an action in the Circuit Court of Cook County seeking $750,000 for recovery on the payment bond posted by Harbour for the project. On January 18, 2013, plaintiff filed the instant action.

## DISCUSSION

**I.      Harbour's Motion to Dismiss for Lack of Standing**

Plaintiff's first three claims allege RICO violations. The civil RICO statute provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue ... in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). Both the "injured in business or property" element and the causation component - whether an alleged RICO injury was caused "by reason of" a violation of the statute- have been interpreted as standing requirements that must be satisfied to prevail on a RICO claim. See Gagan v. American Cablevision, Inc., 77 F.3d 951, 958-59 (7th Cir. 1996); Beck v. Prupis, 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). In evaluating the proximate cause component, the Seventh Circuit has held that "[a]ny recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of predicate acts, ... [and] that a showing of RICO injury requires proof of a concrete financial loss and does not encompass mere injury to a valuable intangible property interest." Evans v. City of Chicago, 434 F.3d 916, 932 (7th Cir.

7

2006) (internal citations omitted) overruled on other grounds by Hill v. Tangherlini, 12-3447, 2013 WL 3942935 (7th Cir. Aug. 1, 2013).

In Evans, the plaintiff claimed that due to the alleged racketeering activities of the police officer defendants, he was forced to incur additional attorney's fees to defend against charges for which he was later vindicated. The plaintiff, however, was convicted of some of the charges against him, and the court determined that the portion of attorney's fees that could be attributed to the vindicated charges was too speculative a damage amount to confer RICO standing.

Harbour and EDI argue that plaintiff's alleged loss is likewise too speculative to confer standing. In Evans, the Seventh Circuit cited the Second Circuit's opinion in Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003), for the "clear and definite" standard. Harbour and EDI argue that the Motorola line of cases stands for the proposition that a plaintiff must exhaust all collateral sources of recovery before pursuing RICO claims. Because plaintiff is also pursuing its damages in state court in the action against the payment bond, Harbour argues that plaintiff has not exhausted its other sources of recovery, its damages are speculative, and it therefore does not have standing to pursue its RICO claims.

Plaintiff seeks to distinguish Motorola by arguing that the Second Circuit line of cases is limited to instances where the plaintiff lender has collateral available and can foreclose on that collateral to satisfy a debt. This reasoning of pursuing "collateral sources" does not extend, plaintiff argues, to pursuing collateral non-RICO causes of action.

The Motorola decision is not quite as broad as defendants claim. In In re Merrill Lynch Partnerships Litigation, 154 F.3d 56, 59 (2d Cir. 1998), the court clarified that "RICO injury is speculative when contractual or other legal remedies remain which hold out a real possibility that

8

the debt, and therefore the injury, may be eliminated or significantly reduced . . . . [but when] no contractual or other legal remedies [exist] which could assuage the injury, the amount of damages was 'clear and definite.'" Where a plaintiff seeks repayment on the same debt through two different sources, the rule in Motorola applies and the plaintiff lacks RICO standing. When the plaintiff seeks additional or distinct damages that may not be satisfied through contractual and other remedies, however, the Second Circuit has held that it is not foreclosed from asserting RICO claims.

In the instant case, plaintiff admits that the 12th District Police Station Project is at issue in this litigation. The damages claimed arise from that contract, and plaintiff seeks to recover those damages in both its construction claims in the state court action against the payment bond and Count IV's claim of a mechanic's lien. It is telling that all of plaintiff's claims assert the same $750,000 damage calculation allegedly owed on the police station contract. Because plaintiff has not yet exhausted its claim on the construction bond, its damages are not "clear and definite," and it does not have standing to assert its RICO claims.

The court therefore grants Harbour and EDI's motions to dismiss pursuant to Rule 12(b)(1).

## II.   CBPC's Motion to Decline Supplemental Jurisdiction

CPBC argues that none of the federal claims in plaintiff's complaint are directed against CPBC, and the federal claims that are pled do not include RICO damages. CPBC therefore claims that plaintiff has no standing to bring a civil RICO case, the RICO counts should be dismissed, and the entire case should be dismissed for refiling in state court. In the alternative,

9

CPBC argues that the court should decline to exercise jurisdiction over CPBC on the remaining state law counts.

Because the court has dismissed plaintiff's RICO claims, no federal claims remain in the lawsuit. The court therefore declines to consider plaintiff's state law claims and dismisses the remainder of plaintiff's counts without prejudice to plaintiff refiling in state court.

## **CONCLUSION**

For the reasons described above, the court grants Harbour's motion to dismiss for lack of standing (Doc. 36), EDI's motion to dismiss for lack of standing, and CBPC's motion to decline to exercise supplemental jurisdiction (Doc. 21).

**ENTER:** October 28, 2013

_____
**Robert W. Gettleman**
**United States District Judge**